**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | |
|---|---|
| DANIEL ELMORE, ) | CASE NO.  1:10-cv-1606 |
| ) | |
| Plaintiff, ) | |
| ) | MAGISTRATE JUDGE |
| v. ) | VECCHIARELLI |
| ) | |
| MICHAEL J. ASTRUE, ) | |
| Commissioner of Social Security, ) | |
| ) | **MEMORANDUM OPINION AND** |
| Defendant. ) | **ORDER** |

Plaintiff, Daniel Elmore ("Plaintiff"), challenges the final decision of Defendant, Michael J. Astrue, Commissioner of Social Security ("the Commissioner"), denying Plaintiff's application for Supplemental Security Income ("SSI") under XVI of the Social Security Act, 42 U.S.C. § 1381 *et seq.* ("the Act").  This Court has jurisdiction pursuant to 42 U.S.C. § 405(g).  This case is before the undersigned United States Magistrate Judge pursuant to the consent of the parties entered under the authority of 28 U.S.C. § 636(c)(2).  For the reasons set forth below, the Commissioner's final decision is AFFIRMED.

### I.  PROCEDURAL HISTORY

On September 16, 2005, Plaintiff protectively filed an application for SSI and alleged a disability onset date of October 1, 2003.  (Tr. 11.)  The application was denied initially and upon reconsideration, so Plaintiff requested a hearing before an administrative law judge ("ALJ").  (Tr. 11.)  On November 5, 2008, an ALJ held Plaintiff's hearing.  (Tr. 11.)  Plaintiff appeared at his hearing, was represented by an attorney, and testified.  (Tr. 11.)  A medical expert ("ME") and vocational expert ("VE") also appeared and testified.  (Tr. 11.)

On April 10, 2009, the ALJ found Plaintiff not disabled.  (Tr. 28.)  On June 16, 2010, the Appeals Council declined to review the ALJ's decision, so the ALJ's decision became the Commissioner's final decision.  (Tr. 2.)  On July 22, 2010, Plaintiff timely filed his complaint challenging the Commissioner's final decision.  (Doc. No. 1.)  On December 19, 2010, Plaintiff filed his Brief on the Merits (Doc. No. 13), and on January 14, 2011, the Commissioner filed his Brief on the Merits (Doc. No. 15).  Plaintiff did not file a Reply Brief.

Plaintiff asserts two assignments of error:  (1) the ALJ's RFC determination is not supported by substantial evidence because the ALJ failed to order a consultative examination to determine how often Plaintiff required changing positions from sitting to standing throughout the workday and instead based his determination on his observation of Plaintiff at the hearing; and (2) the ALJ failed to assess the credibility of Plaintiff's subjective statements of pain properly pursuant to *Duncan v. Secretary of Health and Human Services*, 801 F.2d 847 (6th Cir. 1986).

2

## II. EVIDENCE

### A. Personal and Vocational Evidence

Plaintiff was 44 years old on his alleged disability onset date and 49 years old on the date the ALJ rendered his decision. (*See* Tr. 11, 26.) Plaintiff had at least a high school education and was able to communicate in English. (Tr. 26.) Plaintiff had past relevant work as a kitchen helper, cleaner, and vendor. (Tr. 25.)

### B. Medical Evidence

Only one medical issue is relevant to the disposition of Plaintiff's challenge to the Commissioner's final decision: how frequently Plaintiff would need to change positions between sitting and standing throughout the workday. Accordingly, the following recitation of medical evidence will be limited to that issue.

On July 29, 2005, after complaining of pain with weight bearing in his left hip and groin and exhibiting a marked limp, Plaintiff underwent an x-ray of his pelvis. (Tr. 677.) Radiologist Miguel M. Avenido interpreted the x-ray and diagnosed Plaintiff with "marked arthritis of both hips." (Tr. 677.) It is undisputed that Plaintiff required the use of a cane to ambulate. (Tr. 17; *see also* Tr. 647, 649, 766.)

On December 2005, state agency consultative physician, Dr. Jerry McCloud, M.D., reviewed Plaintiff's medical record and assessed Plaintiff's physical residual functional capacity ("RFC") as follows. (Tr. 594-602.) Plaintiff could lift 20 pounds occasionally and 10 pounds frequently; could stand and walk for at least 2 hours in an 8-hour workday with normal breaks; could sit for about 6 hours in an eight hour workday with normal breaks; and had an unlimited ability to push and pull except to the extent

that he was limited in his ability to lift and carry.  (Tr. 595.)  He could occasionally stoop, kneel, and crouch; but he could never climb ladders, ropes, and scaffolds.  (Tr. 596.)  He had no manipulative, visual, communicative, and environmental limitations.  (Tr. 597-98.)

Between October 2005 and February 2006, various physician assistants and nurses at the Veterans Affairs Medical Center ("VAMC") reported that Plaintiff was "working I.T." as an assistant in the Physical Therapy department of the Medical Center.  (Tr. 521, 714.)

On April 12, 2006, Plaintiff underwent a physical therapy consultation with physical therapist Charles A. Polomsky.  (Tr. 496.)  Mr. Polomsky reported upon examination that Plaintiff had an antalgic gait caused by his right hip.  (Tr. 496.)

On May 26, 2006, Plaintiff presented to the orthopedic clinic at the VAMC for a follow-up on his left hip osteoarthritis.  (Tr. 490.)  Resident physician Brian Hardy attended to Plaintiff and indicated the following.  Plaintiff reported that his hip pain had increased recently.  (Tr. 490.)  Plaintiff rated his pain at 8 on a scale to 10 in severity and explained that it hurt with weight bearing and was "somewhat relieved" with rest.  (Tr. 490.)  Upon physical examination, Dr. Hardy reported that Plaintiff had "extremely limited range of motion of the left hip" with "almost no internal or external rotation," and all motion in the hip was limited by pain.  (Tr. 490.)  Dr. Hardy assessed Plaintiff with severe osteoarthritis of the left hip.  (Tr. 490.)  Dr. Hardy and Plaintiff discussed whether Plaintiff should obtain a hip replacement and they agreed to proceed toward that end.  (Tr. 490.)

On September 19, 2006, Plaintiff presented to resident physician Andrew Islam

4

at the VAMC for a follow-up regarding his left hip osteoarthritis.  (Tr. 437-38.)  Dr. Islam reported that conservative treatment was not improving Plaintiff's hip pain.  (Tr. 437.)  Upon examination of Plaintiff's hip, Dr. Islam reported that Plaintiff had "very limited internal and external rotation secondary to pain."  (Tr. 437.)  Dr. Islam indicated that he informed Plaintiff he would place Plaintiff on a waiting list for a hip replacement.

On November 1, 2006, resident physician Todd Smith at the VAMC authored a Medicine Outpatient Follow-up Note and indicated therein that Plaintiff exhibited a slow gait that was restricted by pain (Tr. 427), and suffered pain with weight bearing activity (Tr. 428).

Throughout 2007, Plaintiff continued to present to the VAMC with complaints of pain that were consistent with his previous visits.  (*See* Tr. 264-66, 302-03, 406-07.)  On July 14, 2007, Plaintiff complained of suffering back pain for the past four days after he lifted and carried an appliance around his house.  (Tr. 329.)  On October 31, 2007, Plaintiff reported that his hip pain prevented him from performing chores that required "heavy" work at the Veteran's homeless shelter where he lived.  (Tr. 255.)

On January 30, 2008, Plaintiff underwent a left total hip replacement.  (*See* Tr. 109, 139, 251.)

On April 8, 2008, Plaintiff presented to resident physician Frederick Oldenburg at the VAMC orthopedic outpatient clinic for a follow-up on his hip replacement.  (Tr. 139.)  Dr. Oldenburg indicated that Plaintiff reported the following.  Plaintiff "had very good results . . . and is very pleased," and "continued to do well with minimal pain."  (Tr. 139.)  Plaintiff also had arthritis in his right hip and was willing to pursue a right hip replacement in the future.  (Tr. 139.)

5

On June 30, 2008, Plaintiff presented to physician Josephine Sabharwal at the VAMC for a mental health medication follow-up, and Dr. Sabharwal indicated that Plaintiff reported "he is doing well[,] . . . has been accepted into the VA in Virginia and that he will be working as well."  (Tr. 118.)

On September 30, 2008, Plaintiff returned to Dr. Sabharwal, and Dr. Sabharwal indicated that Plaintiff reported that "he is doing well," although he decided not to move to Virginia.  (Tr. 114.)

On October 10, 2008, Plaintiff presented to psychiatrist Richard Mason at the VAMC, and Dr. Mason indicated that Plaintiff reported continuing recovery from his hip replacement at Candlewood Nursing Home.  (Tr. 109.)

**D.    Hearing Testimony**

**1.    Plaintiff's Testimony**

Plaintiff testified at his hearing as follows.  He had undergone a left hip replacement; had "a bad right hip" and degenerating discs in his back; had undergone surgery on the fifth digit toe on his right foot in 2006; and had "a lot of mental issues." (Tr. 955.)  He used to abuse drugs and alcohol but had maintained his sobriety from drugs since May, 2002, and his sobriety from alcohol since April, 2005.  (Tr. 956.)

Plaintiff explained that, as a result of his severe hip problems, he had difficulty walking and required a cane to ambulate.  (Tr. 958.)  It would be difficult for him to walk a city block on unpaved surface.  (Tr. 959.)  He would not be able to stand or walk for more than two hours in a day, even with breaks.  (Tr. 959-60.)  He also had difficulty climbing, stooping, crouching, kneeling and crawling.  (Tr. 960.)  As a result of

6

the severe arthritis in his right hip, he had been advised that he would need a right total hip replacement within two to three years. (Tr. 961.) Vicodin and Tylenol helped relieve his chronic pain. (Tr. 962.)

### 2. The ME's and VE's Testimony

The ME testified that he had the credentials of a medical doctor, was a physician, was Board certified in psychiatry, and practiced medical psychiatry and community psychiatry. (Tr. 963.) He then summarized Plaintiff's medical evidence and opined that, although Plaintiff's lifting and carrying ability suggested he could perform light work, Plaintiff's standing and walking ability would limit him to less than light work. (Tr. 969.)

The ALJ then posed to the VE a hypothetical person whose limitations included the need for a cane to ambulate and a sit/stand option. (Tr. 976.) The VE testified that such a person could not perform Plaintiff's past relevant work. (Tr. 977.) The VE then expressed his concern over such a hypothetical person's need of a cane and sit/stand option:

> [I]f [Plaintiff] had to use one hand to lean on something, either the cane or the table that he was working at while he was working, if that was to take him off task—as he's got a sit/stand option, so he's changing positions, and if that activity caused him to be off task more than—even 8 to 10 percent of the time, it could eliminate the jobs I'm about to give you.

(Tr. 977.) The VE then testified to three unskilled sedentary jobs that a hypothetical person such as that posed by the ALJ could perform: bench assembler (for which there were 400 jobs regionally and 70,000 nationally); wire worker (for which there were 500 jobs regionally and 70,000 nationally); and bonder (for which there were 550 jobs regionally and 78,000 nationally). (Tr. 978-80.) The VE explained that the bench

7

assembler and wire worker jobs were generally defined as light work but, based on the ALJ's hypothetical, he reduced the numbers of jobs to reflect those that could be performed at a sedentary work level.  (Tr. 978-79.)

The ALJ then attempted to elicit from the ME specifically how Plaintiff's limitations in standing and walking would affect Plaintiff's ability to work, and the ME explained that the amount of time Plaintiff would need to lean upon or push off of his cane to support himself to transition from sitting to standing depended on how many times he had to transition from sitting to standing.  (Tr. 988, 991.)  The ME specified that if Plaintiff had to transition six times every hour (once every 10 minutes), it might take him 30 seconds to a minute to get into a comfortable position each time (Tr. 988); and if he needed to transition only once or twice, for example, "it wouldn't take six minutes."  (Tr. 989.)

The ALJ returned to the VE and asked how much time a person could be off task before there would no longer be a significant number of jobs that he could perform.  (Tr. 991.)  The VE responded that a person who was off task 8 to 10 percent of the time, or 5 to 6 minutes per hour, would not be able to perform a significant number of jobs in the national economy.  (Tr. 991.)

### III.    STANDARD FOR DISABILITY

A claimant is entitled to receive benefits under the Social Security Act when she establishes disability within the meaning of the Act.  20 C.F.R. § 416.905; *Kirk v. Sec'y of Health & Human Servs.,* 667 F.2d 524 (6th Cir. 1981).  A claimant is considered disabled when she cannot perform "substantial gainful activity by reason of any

medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 416.905(a). To receive SSI benefits, a recipient must also meet certain income and resource limitations. 20 C.F.R. §§ 416.1100 and 416.1201.

The Commissioner reaches a determination as to whether a claimant is disabled by way of a five-stage process. 20 C.F.R. §§ 404.1520(a)(4) and 416.920(a)(4); *Abbott v. Sullivan,* 905 F.2d 918, 923 (6th Cir. 1990). First, the claimant must demonstrate that she is not currently engaged in "substantial gainful activity" at the time she seeks disability benefits. 20 C.F.R. §§ 404.1520(b) and 416.920(b). Second, the claimant must show that she suffers from a "severe impairment" in order to warrant a finding of disability. 20 C.F.R. §§ 404.1520(c) and 416.920(c). A "severe impairment" is one that "significantly limits . . . physical or mental ability to do basic work activities." *Abbot,* 905 F.2d at 923. Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment meets a listed impairment, the claimant is presumed to be disabled regardless of age, education or work experience. 20 C.F.R. §§ 404.1520(d) and 416.920(d). Fourth, if the claimant's impairment does not prevent her from doing her past relevant work, the claimant is not disabled. 20 C.F.R. §§ 404.1520(e)-(f) and 416.920(e)-(f). For the fifth and final step, even if the claimant's impairment does prevent her from doing her past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled. 20 C.F.R. §§

9

404.1520(g), 404.1560(c), *and* 416.920(g).

## IV. SUMMARY OF COMMISSIONER'S DECISION

The ALJ made the following findings of fact and conclusions of law:

1. Mr. Elmore has not engaged in substantial gainful activity from October 1, 2003, the alleged onset date, through the date of this decision.

2. From October 1, 2003, the alleged onset date, through the date of this decision, Mr. Elmore had and has the following severe impairments: Degenerative joint disease and osteoarthritis of both hips, status post arthoplasty of the left hip in January 2008 . . . . Obesity . . . . Mood disorder [and] Antisocial personality traits.

3. From October 1, 2003, the alleged onset date, through the date of this decision, Mr. Elmore did not and does not have an impairment or combination of impairments that met, meets, medically equaled, or medically equals the criteria for any Listed Impairment in the Listing of Impairments, 20 CFR Part 404, Subpart P, Appendix 1.

4. After careful consideration of the entire record, I find that, from October 1, 2003, the alleged onset date, through the date of this decision, Mr. Elmore had and has the residual functional capacity to perform work activities except for the following limits on Mr. Elmore's ability to work:

    Mr. Elmore could not and cannot lift or carry more than 20 pounds occasionally or 10 pounds frequently.

    Mr. Elmore could not and cannot stand and/or walk more than a total of 2 hours per 8-hour workday.

    Mr. Elmore must be able to alternate between sitting and standing.

    Mr. Elmore must be permitted to ambulate with a cane in the workplace. Mr. Elmore did not and does not need a cane except to ambulate.

    Mr. Elmore could not and cannot climb ladders, ropes, or scaffolds.

>
> Mr. Elmore could and can climb ramps or steps but not more than occasionally and then only with a railing. Without a railing, Mr. Elmore could not and cannot climb ramps or steps.
>
> Mr. Elmore could not and cannot bend, stoop, crouch, kneel, or crawl more than occasionally.
>
> Mr. Elmore could not and cannot work in proximity to dangerous moving machinery, unprotected heights, or other workplace hazards.
>
> Mr. Elmore could and can do only routine, low-stress work.
>
> Mr. Elmore could not and cannot do work involving high or strict production quotas.
>
> Mr. Elmore could not and cannot do any work involving negotiation, arbitration, confrontation, or other intense interpersonal interactions with the public, coworkers, or supervisors.
>
> Mr. Elmore could not and cannot do any work involving any interactions with the public.
>
> Mr. Elmore could not and cannot do any work involving more than minimal interactions with coworkers or supervisors.
>
> 5. From October 1, 2003, the alleged onset date, through the date of this decision, Mr. Elmore was and is unable to do any of his past relevant work.
>
> . . . . .
>
> 9. Mr. Elmore does not have any transferrable job skills.
>
> 10. Considering Mr. Elmore's age, education, work experience, and residual functional capacity, there were and are jobs that existed and exist in significant numbers in the national economy that he could and can do.
>
> 11. Mr. Elmore has not been under a disability, as defined by in the Social Security Act, at any time from October 1, 2003, the alleged onset date, through the date of this decision.

(Tr. 13-28.)

## V. LAW & ANALYSIS

### A. Standard of Review

Judicial review of the Commissioner's decision is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards. *Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010). Review must be based on the record as a whole. *Heston v. Comm'r of Social Security*, 245 F.3d 528, 535 (6th Cir. 2001). The court may look into any evidence in the record to determine if the ALJ's decision is supported by substantial evidence, regardless of whether it has actually been cited by the ALJ. *Id.* However, the court does not review the evidence *de novo*, make credibility determinations, or weigh the evidence. *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

The Commissioner's conclusions must be affirmed absent a determination that the ALJ failed to apply the correct legal standards or made findings of fact unsupported by substantial evidence in the record. *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009). Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Brainard*, 889 F.2d at 681. A decision supported by substantial evidence will not be overturned even though substantial evidence supports the opposite conclusion. *Ealy*, 594 F.3d at 512.

### B. Whether the ALJ Should Have Obtained a Consultative Examination

Plaintiff argues that remand is warranted because the ALJ failed to order a

12

consultative examination to determine how often Plaintiff required changing positions between sitting and standing throughout the workday and instead based his determination on his observation of Plaintiff at the hearing.[1] The Court disagrees.

A consultative examination normally is required under circumstances that include when a conflict, inconsistency, ambiguity, or insufficiency in the evidence must be resolved, and the ALJ is not able to do so by re-contacting the claimant's medical source. 20 C.F.R. § 404.1519a(b)(4). In other words, an ALJ is not required to refer a claimant for a consultative examination unless the record establishes that such an examination "is *necessary* to enable the administrative law judge to make the disability decision. *Landsaw v. Sec'y of Health & Human Servs.*, 803 F.2d 211, 214 (6th Cir. 1986) (quoting *Turner v. Califano*, 563 F.2d 669, 671 (5th Cir. 1977)).

Plaintiff contends that a consultative examination was necessary here because there is no evidence of how often Plaintiff needed to transition between sitting and standing—particularly "no opinion evidence on this issue."[2] There was, however, evidence in the record bearing directly on the question of how often Plaintiff would need to transition between sitting and standing—particularly opinion evidence. The ALJ

---

[1] Plaintiff also states that there was no evidence regarding whether he required a cane to ambulate, balance, or both. It is not disputed, however, that Plaintiff required a cane to ambulate. Moreover, Plaintiff poses the question of whether he required a cane to balance in relation to how often he needed to change positions; therefore, the relevant question is not whether he required a cane to balance, but how often he needed to change positions.

[2] Plaintiff explains that the question of how often he would have to change positions is important because, if he had to change positions many times, the ME's and VE's testimony might support the conclusion that he would not be able to perform any work.

explained that he based his RFC determination on the entire record (Tr. 17, 24), including Dr. McCloud's opinion that Plaintiff could sit for about 6 hours, and stand and walk for at least 2 hours with normal breaks during an 8-hour workday (Tr. 21). Dr. McCloud was a state agency consultative physician, and a state agency consultative physician's medical opinion is considered an expert opinion. S.S.R. 96-6p, 1996 WL 374180, at *1.

Plaintiff has not explained how the record as a whole, including Dr. McCloud's opinion, does not support the ALJ's RFC determination. Moreover, Plaintiff has not cited any legal authority to support the contention that it was inappropriate for the ALJ to based his RFC determination *in part* on his observation of Plaintiff at the hearing as well as on the record as a whole. Accordingly, this assignment of error lacks merit.

### C. The ALJ's Assessment of Plaintiff's Credibility

Plaintiff argues that remand is warranted because the ALJ failed to assess the credibility of Plaintiff's subjective statements of pain properly pursuant to *Duncan v. Secretary of Health and Human Services*, 801 F.2d 847 (6th Cir. 1986). The Court disagrees.

It is well settled that pain alone, if caused by a medical impairment, may be severe enough to constitute a disability. *See Kirk v. Sec'y of Health & Human Servs.*, 667 F.2d 524, 538 (6th Cir. 1981), *cert. denied*, 461 U.S. 957 (1983). In evaluating whether a claimant is disabled by pain, the Commissioner must first determine whether there is objective medical evidence of an underlying medical condition. *Duncan v. Sec'y of Health & Human Servs.*, 801 F.2d 847, 853 (6th Cir. 1986). If there is, the

14

Commissioner must examine: (1) whether objective medical evidence confirms the severity of the alleged pain arising from the condition; or (2) whether the objectively established medical condition is of such a severity that it can reasonably be expected to produce the alleged disabling pain. *Id.*

The ALJ explained in his decision that Plaintiff suffered at least two severe impairments relating to Plaintiff's physical pain: degenerative joint disease and osteoarthritis of both hips, status post arthoplasty of the left hip, and obesity. (Tr. 13.) The ALJ then explained that, based on the objective medical evidence and other evidence in the record, Plaintiff's subjective statements of his symptoms were credible to the extent that they conformed to the ALJ's RFC determination, but were not credible to the extent that they exceeded the RFC determination. (Tr. 17.) This analysis addresses the issues raised under the *Duncan* test, as it addresses whether there was objective medical evidence of an underlying medical condition that could cause the alleged pain, and whether objective medical evidence confirmed the severity of the alleged pain arising from the condition or whether the objectively established medical condition was of such a severity that it could reasonably be expected to produce the alleged disabling pain.

Plaintiff recites evidence in the record that, when analyzed under the *Duncan* test, supports the conclusion that Plaintiff's subjective statements of pain are credible. This argument is not relevant to whether the ALJ properly applied the *Duncan* test. Moreover, this argument is based on an incorrect legal standard, as a decision supported by substantial evidence will not be overturned even though substantial

15

evidence supports the opposite conclusion. *Ealy*, 594 F.3d at 512.

In short, Plaintiff does not explain how the ALJ's analysis of the credibility of Plaintiff's subjective statements of pain falls short of the *Duncan* test. The Court will not speculate, without any guidance from Plaintiff, on how the ALJ's analysis of Plaintiff's credibility might fall short of the *Duncan* test when a review of the ALJ's decision supports the conclusion that the ALJ addressed the relevant issues under the test. *See McPherson v. Kelsey*, 125 F.3d 989, 995-96 (6th Cir.1997) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived. It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to put flesh on its bones."); *Meridia Prods. Liab. Litig. v. Abbott Labs.*, 447 F.3d 861, 868 (6th Cir. 2006) (citing *McPherson*). Accordingly, this assignment of error lacks merit.

## VI. CONCLUSION

For the foregoing reasons, the Commissioner's final decision is AFFIRMED.

**IT IS SO ORDERED**.

                         s/ *Nancy A. Vecchiarelli*
                         U.S. Magistrate Judge

Date: August 25, 2011